15-1831

IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

◆◆

SUHAIL NAJIM ABDULLAH AL SHIMARI; TAHA YASEEN ARRAQ RASHID;
SALAH HASAN NUSAIF AL-EJAILI; ASA'AD HAMZA HANFOOSH AL-ZUBA'E,

*Plaintiffs-Appellants,*

—and—

SA'AD HAMZA HANTOOSH AL-ZUBA'E,

*Plaintiff,*

—v.—

CACI PREMIER TECHNOLOGY, INC.,

*Defendant-Appellee,*

—and—

TIMOTHY DUGAN; CACI INTERNATIONAL, INC.; L-3 SERVICES, INC.,

*Defendants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA (ALEXANDRIA)

---

## BRIEF FOR PLAINTIFFS-APPELLANTS
## [REDACTED]

---

BAHER AZMY
  *Counsel of Record*
KATHERINE GALLAGHER
CENTER FOR CONSTITUTIONAL
  RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
(212) 614-6464

ROBERT P. LOBUE
PATTERSON BELKNAP WEBB
  & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

SHEREEF HADI AKEEL
AKEEL & VALENTINE, P.C.
888 West Big Beaver Road
Troy, Michigan 48084
(248) 918-4542

JEENA SHAH
CONSTITUTIONAL RIGHTS
  & INTERNATIONAL HUMAN
  RIGHTS CLINIC
Rutgers School of Law
123 Washington Street
Newark, New Jersey 07102
(973) 353-3235

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... iii

STATEMENT OF JURISDICTION ................................................................1

ISSUES PRESENTED ...................................................................................1

STATEMENT OF THE CASE .......................................................................3

    A.    Relevant Procedural History .....................................................4

    B.    The District Court's PQD Decision ...........................................7

STATEMENT OF FACTS ..............................................................................9

    A.    Abuse of Plaintiffs Outside of Formal Interrogations at the "Hard Site" ................................................................................9

    B.    CACI Controlled Its Employees and Maintained Discretion to Conduct Formal Interrogations ...............................................11

           1.    The CACI Contract and Military Regulations Required CACI to Control and Supervise Its Employees ...................11

           2.    CACI Established Its Own Reporting Lines and Control Structure ........................................................................12

    C.    Absence of Control of CACI Personnel Outside of Formal Interrogations .......................................................................15

           1.    The Command Vacuum at Abu Ghraib Precluded Military Control over CACI ...............................................16

           2.    CACI Interrogators Controlled the MPs .............................18

           3.    CACI Employees Directed the Abuse of Prisoners ............19

    D.    Testimony of CACI's Military Officer Declarants on which the District Court Relied Is Irrelevant to the "Facts on the Ground" and Contradicted by Their Prior Inconsistent Statements and Admitted Lack of Personal Knowledge ..............21

    E.    The Conduct Alleged by Plaintiffs Was Never Authorized or Was Expressly Prohibited by the Military .............................23

SUMMARY OF ARGUMENT .......................................................................25

STANDARD OF REVIEW .............................................................................28

8198372v.6

**ARGUMENT** ........................................................................................**30**

**I.**    **THE DISTRICT COURT'S EXPANSIVE INTERPRETATION OF THE POLITICAL QUESTION DOCTRINE EXCEEDS PERMISSIBLE BOUNDS SET BY *TAYLOR* AND SUPREME COURT PRECEDENT AND ABDICATES ITS OBLIGATION TO REVIEW THE STATUTORY CLAIMS AND INTENTIONAL TORTS ASSERTED IN THIS CASE** ........................................**30**

**II.**   **THE DISTRICT COURT ERRED BY MAKING FACTUAL FINDINGS ON THE MERITS OF PLAINTIFFS' CASE**.....................**36**

**III.**  **THE DISTRICT COURT'S FINDINGS IN APPLYING THE *TAYLOR* PLENARY CONTROL PRONG ARE CLEARLY ERRONEOUS** ...........................................................................**40**

      **A.**    **Because the District Court Failed to Carry out this Court's Mandate to Examine Military Control Outside of Formal Interrogations, and Because the Record Is Undisputed that No Such Control Existed, this Court Should Affirmatively Conclude that *Taylor* Prong One Has Not Been Satisfied** ............**40**

      **B.**    **All of the Additional Record Evidence Regarding CACI's Discretion to Control Employees and Interrogations Demonstrates an Absence of Plenary Military Control** ...............**42**

**IV.**  **BECAUSE PLAINTIFFS' CLAIMS CHALLENGE THE LEGALITY OF CACI'S INTENTIONAL CONDUCT, NOT THE WISDOM OF ANY DISCRETIONARY MILITARY JUDGMENTS, THEY DO NOT IMPLICATE *TAYLOR* PRONG TWO** ........................**47**

**V.**   **PLAINTIFFS' WELL-ESTABLISHED STATUTORY AND INTENTIONAL TORT CLAIMS HAVE JUDICIALLY MANAGEABLE STANDARDS**.................................................**53**

      **A.**    **Torture**....................................................................**55**

      **B.**    **Cruel, Inhuman or Degrading Treatment** ........................**57**

      **C.**    **War Crimes**.............................................................**59**

**CONCLUSION**.................................................................................**60**

8198372v.6

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abebe-Jira v. Negewo*,
72 F.3d 844 (11th Cir. 1996) ..............................................................56

*Adams v. Bain*,
697 F.2d 1213 (4th Cir. 1982) ............................................................36

*In re "Agent Orange" Prod. Liab. Action*,
373 F. Supp. 2d 7 (E.D.N.Y. 2005) .....................................................53

*Al Shimari v. CACI Int'l, Inc.*,
658 F.3d 205 (4th Cir. 2011) ..........................................................5, 32

*Al Shimari v. CACI Int'l, Inc.*,
679 F.3d 205 (4th Cir. 2012) ..........................................................5, 32

*Al Shimari v. CACI Premier Tech., Inc.*,
657 F. Supp. 2d 700 (E.D. Va. 2009) ......................................4, 5, 33, 35

*Al Shimari v. CACI Premier Tech., Inc.*,
758 F.3d 516 (4th Cir. 2014) .......................................................*passim*

*Al-Quraishi v. Nakhla*,
728 F. Supp. 2d 702 (D. Md. 2010) .....................................................57

*Al-Saher v. INS*,
268 F.3d 1143 (9th Cir. 2001) ............................................................56

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*,
452 F.3d 1284 (11th Cir. 2006) ..........................................................59

*Bailey v. Moreno*,
547 Fed. App'x 196 (4th Cir. 2013) .....................................................40

*Baker v. Carr*,
369 U.S. 162 (1962)....................................................30, 31, 34, 53

*Boumediene v. Bush*,
553 U.S. 723 (2008)...........................................................................33

iii

8198372v.6

*Carmichael v. Kellogg, Brown & Root Service Inc.*,
    572 F.3d 1271 (11th Cir. 2009) ..................................................................*passim*

*Cohens v. Virginia*,
    19 U.S. (6 Wheat) 264 (1821) ...........................................................30

*Daliberti v. Republic of Iraq*,
    97 F. Supp. 2d 38 (D.D.C. 2000)........................................................56

*Doe v. Nestlé, S.A.*,
    748 F. Supp. 2d 1057 (C.D. Cal. 2010) ...........................................57

*Doe v. Qi*,
    349 F. Supp. 2d 1258 (N.D. Cal. 2004).............................................58

*Easley v. Cromartie*,
    532 U.S. 234 (2001)..........................................................................40

*El-Shifa Pharm. Co. v. United States*,
    607 F.3d 836 (D.C. Cir. 2010)..............................................30, 47, 48

*Filártiga v. Peña-Irala*,
    630 F.2d 876 (2d Cir. 1980) .............................................................54

*Gilligan v. Morgan*,
    413 U.S. 1 (1973)...................................................................30, 34, 49

*Hamdan v. Rumsfeld*,
    548 U.S. 557 (2006)...............................................................33, 59, 60

*Hamdi v. Rumsfeld*,
    542 U.S. 507 (2004) ........................................................................35

*Harris v. Kellogg Brown & Root Servs., Inc.*,
    724 F.3d 458 (3d Cir. 2013) .....................................................*passim*

*Jama v. U.S. I.N.S.*,
    22 F. Supp. 2d 353 (D.N.J. 1998)....................................................58

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
    478 U.S. 221 (1986)..........................................................................48

8198372v.6

*In re KBR, Inc.*,
   925 F. Supp. 2d 752 (D. Md. 2013)....................................................45

*In re KBR, Inc., Burn Pit Litig.*,
   744 F.3d 326 (4th Cir. 2014) ...................................................31, 41

*Kerns v. United States*,
   585 F.3d 187 (4th Cir. 2009) ..................................................36, 39

*Kiobel v. Royal Dutch Petroleum Co.*,
   133 S. Ct. 1659 (2013)................................................................5, 6

*Lane v. Halliburton*,
   529 F.3d 548 (5th Cir. 2008) ...........................................................50

*Little v. Barreme*,
   6 U.S. (2 Cranch) 170 (1804) .........................................................34

*Marbury v. Madison*,
   5 U.S. (1 Cranch) 137 (1803) .........................................................54

*McMahon v. Presidential Airways, Inc.*,
   502 F.3d 1331 (11th Cir. 2007) ...........................................28, 43, 44

*Mehinovic v. Vuckovic*,
   198 F. Supp. 2d 1322 (N.D. Ga. 2002)............................................58

*Miller v. Mercy Hospital*,
   720 F.2d 356 (4th Cir. 1983) ...........................................................40

*Mitchell v. Harmony*,
   54 U.S. (12 How) 115 (1851) ..........................................................34

*Padilla v. Yoo*,
   678 F.3d 748 (9th Cir. 2012) ...........................................................56

*The Paquette Habana*,
   175 U.S. 677 (1900).........................................................................34

*Price v. Socialist People's Libyan Arab Jamahiriya*,
   294 F.3d 82 (D.C. Cir. 2002).............................................................56

8198372v.6

*Richardson v. McKnight*,
　　521 U.S. 399 (1997).................................................................57

*Richmond, F. & P. R. Co. v. United States*,
　　945 F.2d 765 (4th Cir. 1991) ................................................36

*S. Atl. Ltd. P'ship of Tenn., L.P. v. Riese*,
　　356 F.3d 576 (4th Cir. 2004) ................................................29

*Saleh v. Titan Corp.*,
　　580 F.3d 1 (D.C. Cir. 2009)...................................45, 46, 47

*Sosa v. Alvarez-Machain*,
　　542 U.S. 692 (2004)........................................................*passim*

*Surette v. Islamic Republic of Iran*,
　　231 F. Supp. 2d 260 (D.D.C. 2002)....................................56

*Tachiona v. Mugabe*,
　　234 F. Supp. 2d 401 (S.D.N.Y. 2002) ...............................58

*Taylor v. Kellogg Brown & Root Services, Inc.*,
　　658 F.3d 402 (4th Cir. 2011) ......................................*passim*

*Tiffany v. United States*,
　　931 F.2d 271 (4th Cir. 1991) ................................................49

*United States v. Hall*,
　　664 F.3d 456 (4th Cir. 2012) ................................................40

*United States v. Martinez-Melgar*,
　　591 F.3d 733 (4th Cir. 2010) ................................................40

*United States v. North Carolina*,
　　180 F.3d 574 (4th Cir. 1999) ................................................36

*United States v. U.S. Gypsum Co.*,
　　333 U.S. 364 (1948).................................................................40

*Veith v. Jubelirer*,
　　541 U.S. 267 (2004).................................................................48

8198372v.6

*United States ex rel. Vuyyuru v. Jadhav*,
    555 F.3d 337 (4th Cir. 2009) ...............................................28, 36, 39

*William v. AES*,
    28 F. Supp. 3d 553, 566 (E.D. Va. 2014) ...........................................58

*Wiwa v. Royal Dutch Petroleum Co.*,
    No. 96 CIV. 8386 (KMW), 2002 U.S. Dist. LEXIS 3293 (S.D.N.Y.
    Feb. 22, 2002) ...........................................................................58

*Wu Tien Li-Shou v. United States*,
    777 F.3d 175 (4th Cir. 2015) ...........................................................49

*In re Xe Servs. Alien Tort Litig.*,
    665 F. Supp. 2d 569 (E.D. Va. 2009) ..............................................60

*Zivotofsky v. Clinton*,
    132 S. Ct. 1421 (2012)..........................................................*passim*

## Statutes

18 U.S.C. § 2340 .......................................................................*passim*

18 U.S.C. §§ 2340-2340B ........................................................24, 48

18 U.S.C. § 2441 .......................................................................*passim*

28 U.S.C. § 1291 .................................................................................1

28 U.S.C. § 1331 .................................................................................1

28 U.S.C. § 1332...............................................................................1

28 U.S.C. § 1350...................................................................*passim*

28 U.S.C. § 1350 note ......................................................24, 55

28 U.S.C. § 1367 ...............................................................................1

## Other Authorities

Fed. R. Evid. 803(8)...........................................................................17

Fed. R. Civ. P. 12(b)(1)..................................................27, 35, 38, 39

Geneva Convention Relative to the Protection of Civilian Persons in
Time of War, Aug. 12, 1949, 75 U.N.T.S. 287 ......................................24, 57, 59

Geneva Convention Relative to the Treatment of Prisoners of War,
Aug. 12, 1949, 75 U.N.T.S. 135 ..................................................................24, 59

UN General Assembly, *Convention Against Torture and Other Cruel,
Inhuman or Degrading Treatment or Punishment*, 10 December
1984, United Nations, Treaty Series, vol. 1465, p. 85..................................25, 55

U.S. Dep't of the Army, *Field Manual 3-100.21 (100-21):
Contractors on the Battlefield*, ¶ 1-22 (Jan. 2003) ......................................12, 26

viii

## STATEMENT OF JURISDICTION

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1332 (diversity jurisdiction); 28 U.S.C. § 1350 (Alien Tort Statute); and 28 U.S.C. § 1367 (supplemental jurisdiction). This appeal is taken from a final judgment dismissing all claims entered on June 24, 2015, A1407, for which a separate opinion and order was entered on June 18, 2015, A1379. Plaintiff-Appellants ("Plaintiffs") timely filed a Notice of Appeal on July 23, 2015. A1408. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED

In this civil tort action brought by four victims of the abuse at the Abu Ghraib prison in Iraq against the contractor that supplied interrogators to the U.S. military at Abu Ghraib:

1.      Did the District Court err in adopting an overbroad interpretation of the political question doctrine ("PQD") from Judge Niemeyer's dissenting and vacated opinions in prior appeals, which is inconsistent with both Supreme Court precedent and a proper application of *Taylor v. Kellogg Brown & Root Services, Inc.*, 658 F.3d 402 (4th Cir. 2011) ("*Taylor*")?

2.      Did the District Court err in making factual findings at the motion-to-dismiss stage on issues that are intertwined with the merits of Plaintiffs' claims, in contravention of Fourth Circuit precedent?

1

3.      Even assuming the District Court properly reached the factual issues relevant to the PQD, did the court fail to carry out the mandate of this Court to conduct a "discriminating analysis" under *Taylor*, where it failed to consider evidence demonstrating an absence of direct or plenary military control of the conduct of CACI personnel at Abu Ghraib, including substantial evidence addressing this Court's specific concern about the level of control outside of the formal interrogation structure?

4.      Even assuming the District Court properly reached the factual issues relevant to the PQD, did the District Court err in finding that resolution of Plaintiffs' claims would require the Court to question sensitive military judgments under the second component of *Taylor*, where adjudication would only require reviewing the legality of CACI's conduct against established legal and statutory standards, but not the wisdom of any policy decisions, and where the alleged torture and other serious abuse was not and could not legally have been authorized by the military?

5.      Did the District Court err in finding there are no judicially manageable standards governing Plaintiffs' claims of war crimes, torture and cruel, inhuman and degrading treatment, where elements of those claims are set forth in congressional enactments and specific, universal and obligatory common law?

8198372v.6

## STATEMENT OF THE CASE

Plaintiffs are four Iraqi civilians who were tortured and otherwise seriously abused while detained at Abu Ghraib prison, before their eventual release without charge.  Plaintiffs—Suhail Najim Abdullah Al Shimari, Taha Yaseen Arraq Rashid, Salah Hasan Nusaif Jasim Al-Ejaili, and Asa'ad Hamza Hanfoosh Al-Zuba'e—sued CACI Premier Technology, Inc. ("CACI"), a corporation hired by the U.S. government to provide interrogation services, for conspiring with low-level U.S. military personnel to torture and abuse detainees at the Abu Ghraib "Hard Site" in 2003-2004.  A number of CACI's co-conspirators, including Military Police officers Charles Graner and Ivan Frederick III, who provided testimony in this case implicating CACI, were convicted by U.S. courts martial for their role in abusing detainees.

Several military investigations attributed responsibility to CACI employees for directing and participating in abuses at Abu Ghraib.  *Al Shimari v. CACI Premier Tech., Inc.*, 758 F.3d 516, 521 (4th Cir. 2014) ("*Al Shimari II*") (citing reports of Major General Antonio M. Taguba ("Taguba Report") and Major General George R. Fay ("Fay Report")).[1]  The President and Defense Secretary condemned the atrocities and Congress classified the conduct as unambiguously

---

[1] Maj. Gen. Antonio M. Taguba, Investigating Officer, Article 15-6 Investigation of the 800th Military Police Brigade (U) (2004); Maj. Gen. George R. Fay, Investigating Officer, Article 15-6 Investigation of the Abu Ghraib Detention Facility and 205th Military Intelligence Brigade (U) (2004).

3

unlawful, in violation of "policies, orders and laws of the United States and the United States military." *See id*. (quoting H.R. Res. 627, 108th Cong (2004)).

The Third Amended Complaint (A139) alleges war crimes, torture, and cruel, inhuman or degrading treatment ("CIDT") against CACI under the Alien Tort Statute, 28 U.S.C. § 1350, for conduct prohibited by federal law in 18 U.S.C. § 2340 (Torture Statute) and 18 U.S.C. § 2441 (War Crimes Act), as well as common law claims on behalf of Plaintiff Al Shimari for, *inter alia*, assault and battery, and negligent hiring and training.

### A.     Relevant Procedural History

The lengthy procedural history of these proceedings is set forth in *Al Shimari II*.  Most relevant for this appeal is the following:

On March 18, 2009, the District Court denied CACI's motion to dismiss Plaintiffs' common law claims under the PQD, but dismissed Plaintiffs' ATS claims.  With respect to the PQD, the District Court concluded that this case "challenges not the government itself or the adequacy of official government policies, but the conduct of government contractors carrying on a business for profit." *Al Shimari v. CACI Premier Tech., Inc.*, 657 F. Supp. 2d 700, 708-14 (E.D. Va. 2009).  The Court rejected CACI's argument that any claims arising from a wartime context are nonjusticiable, highlighting "the long line of cases where private plaintiffs were allowed to bring tort actions for wartime injuries."

4

*Id.* at 711 (citing cases). The Court concluded that, because Plaintiffs' claims turn on acts in "derogation of United States and international law" they are "entirely justiciable." *Id.* at 710. In the opinion now on appeal, the District Court changed its view of these principles, without explanation.

In May 2012, this Court sitting *en banc* held that the Court lacked jurisdiction over CACI's premature appeal of the 2009 decision. *Al Shimari v. CACI Int'l, Inc.*, 679 F.3d 205, (4th Cir. 2012) (en banc) ("*Al Shimari I*"), *vacating* 658 F.3d 413 (4th Cir. 2011).

On remand, the District Court granted Plaintiffs' motion to reinstate their ATS claims on the ground that torture, war crimes and CIDT are torts whose prohibition is "specific and universal and obligatory" under *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004). (Dkt. 159; dkt. 471, at 26:11-23.) The Court subsequently dismissed as time-barred the common law claims of all Plaintiffs other than Al Shimari (dkt. 226), and dismissed the conspiracy allegations in the Second Amended Complaint as legally insufficient (dkt. 215), even though the factual allegations were more detailed than those in the prior complaint that the Court had already found sufficient. Plaintiffs filed a Third Amended Complaint with additional support for their conspiracy allegations on March 28, 2013. A84.

Following the Supreme Court's decision in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013), the District Court dismissed all of Plaintiffs'

5

remaining claims, finding that it lacked ATS jurisdiction and that Iraqi law governed the remaining common law claims of Al Shimari but precluded liability. (Dkt. 460.)

On Plaintiffs' appeal of that ruling, CACI renewed its argument that the PQD required dismissal of Plaintiffs' claims.

On June 6, 2014, this Court reversed the District Court's ruling that it lacked ATS jurisdiction under *Kiobel*, and vacated the dismissal of Al Shimari's common law claims. *Al Shimari II*, 758 F.3d at 537. This Court did not accept CACI's alternative contention that the issues necessarily raised a political question, explaining that, "the fact that a military contractor was acting pursuant to orders of the military does not, in and of itself, insulate the claim from judicial review," and it remanded for a "discriminating analysis" of the PQD defense on a full record. *Id.* at 531-37.

This Court stressed that the District Court should "determine the extent to which the military controlled the conduct of the CACI interrogators *outside the context of required interrogations*, which is particularly concerning given the Plaintiffs' allegations that '[m]ost of the abuse' occurred at night, and that the abuse was intended to 'soften up' the detainees for later interrogation." *Id.* at 536 (emphasis added).

6

8198372v.6

### B.     The District Court's PQD Decision

After a period of re-opened discovery and briefing, the District Court

granted CACI's PQD motion.  A1379.  Regarding the first component of the

*Taylor* test ("*Taylor* Prong One")—whether or not the military exercised "direct or

plenary control" over CACI—the Court relied on a declaration of a military officer

obtained by CACI and held:

> Because the Court finds the Pappas declaration and other
> testimony presented by Defendant persuasive, it follows that the
> Court finds that the military exercised "plenary" and "direct"
> control over how Defendants interrogated detainees at Abu
> Ghraib.  The military clearly chose how to carry out tasks
> related to the interrogation mission, while CACI had no
> discretion in any operational matters.

A1394.  Despite substantial evidence Plaintiffs introduced that contested this

proposition, including significant—and undisputed—evidence addressing this

Court's particular concern that the military did not control "CACI interrogators

outside the context of required interrogations," the opinion does not mention, let

alone analyze, Plaintiffs' evidence.

With respect to the second prong of the *Taylor* test ("*Taylor* Prong Two")—

whether adjudication would question sensitive military judgments, the District held

that:

> national defense interests are so closely intertwined with
> military decisions governing Defendant's conduct, such that a
> decision on the merits of the claim would require the judiciary
> to question actual, sensitive judgments made by the military,

7

8198372v.6

which the Court is not permitted to do.

A1399.  Although there is no record evidence or contention that any military

officer ordered CACI personnel to abuse detainees, the District Court also assumed

that CACI "would likely defend against the allegations by asserting that their

actions were ordered by the military," which would require the court "to consider

whether military judgments were proper."  A1398.

The District Court likewise found that each of Plaintiffs' ATS claims for

torture, war crimes and CIDT lacked judicially manageable standards, even though

their elements are largely defined by statute and even though the Court had

previously reinstated such claims because they satisfied the *Sosa* requirement that

such torts be "universal and obligatory" and "defined . . .  with specificity."  (Dkt.

159; dkt. 471, at 24:17-24; 26:20-23 (quoting *Sosa*, 542 U.S. at 725).)

Nevertheless, the Court found:  (i) the ATS torture claims lacked manageable

standards because "the lack of clarity as to the definition of torture during the

relevant time period creates enough of [a] cloud of ambiguity," A1403; (ii) the

CIDT claims were similarly unmanageable because of "[t]he Court's doubt as to

the lucidness of a CIDT claim," A1404; and (iii) the "seemingly straightforward

ATS war crime claim" would require "[a] determination as to whether Plaintiffs

were insurgents, innocent civilians, or even innocent insurgents" which would

compel the Court "to step into the shoes of the military," A1405.

8

## STATEMENT OF FACTS

### A.     Abuse of Plaintiffs Outside of Formal Interrogations at the "Hard Site"

Plaintiffs were imprisoned in Tier 1A of the "Hard Site" at Abu Ghraib in 2003, as part of the sometimes chaotic effort by the U.S. military to control the insurgency.  The Defense Department eventually deemed all four to be "civilian internees" and released them without ever charging them with conduct hostile to the United States.[2]

At the Hard Site, which is where the worst of the Abu Ghraib atrocities occurred, military police ("MPs") guarded the detainees and CACI and Military Intelligence personnel ("MI") conducted interrogations.  A734 ¶ 7(a)(3).  Formal interrogation sessions usually occurred in an interrogation center separate from the cells, A862-64, at 141:18-143:6, and usually required an approved interrogation plan.  A913, at 325:12-22; A876-77, at 161:16-162:4.  However, the much-publicized abuses at Abu Ghraib occurred outside these formal interrogation sessions, at night and frequently in the detention blocks.  A738 ¶ 8(f).

---

[2] *See, e.g.*, *Al Shimari II*, 758 F.3d at 521 n. 2. Accordingly, the District Court's apparent concern about determining whether the Plaintiffs were, in fact, "innocent" is not only legally irrelevant, *see infra* Section V(c), but entirely unfounded. A1405.  Indeed, this Court previously recognized, that "[t]he record does not contain any evidence that the plaintiffs were designated 'enemy combatants' by the United States government. In fact, Defense Department documents in the record state that plaintiff Al Shimari '*is not* an Enemy Combatant in the Global War on Terror.'" *Al Shimari II*, 758 F.3d at 521 n. 2.

9

As this Court recognized, Plaintiffs' allegations concern abuse that occurred "outside the context of required interrogations"—typically on the night shift in Tier 1A and intended to "soften up" the Plaintiffs for later formal interrogations. *Al Shimari II*, 758 F.3d at 521-22, 536. And, as recognized by the Taguba and Fay Reports and detailed below, much of the abuse was directed by CACI employees.

Plaintiff Al-Ejaili was picked up on around November 3, 2003, solely because he was a credentialed reporter for Al-Jazeera, the Middle Eastern news service, A629-31, at 9:8-15, 10:5-11:1, and there is no evidence that he was involved in any action hostile to the United States. A94 ¶ 68. At the Hard Site, Al-Ejaili was subjected to repeated beatings, stripped and kept naked, imprisoned in a solitary cell in conditions of sensory deprivation, subjected to extremes of temperature, with both hot and cold water thrown on his naked body, placed in stress positions for extended periods of time, threatened with unleashed dogs, and deprived of food and sleep. A94-95 ¶¶ 69-76.[3] He was released on or about February 1, 2004. A95 ¶ 77. The other Plaintiffs—Al Shimari, Al Zuba'e and Rashid—suffered similar mistreatment at the hands of MPs operating under

---

[3] One of Plaintiffs' experts, Professor Darius Rejali, detailed the ways in which many of these techniques have been used historically by repressive regimes and have been determined to be "torture" by the United States and other nations. A668.

10

direction from CACI personnel.  A91-94 ¶¶ 24-67; A105 ¶¶ 121-122; A107 ¶¶ 132, 134-135; *see also* A767-75; A775-81; A786-91.

### B.  CACI Controlled Its Employees and Maintained Discretion to Conduct Formal Interrogations

Even within the formal interrogation structure, CACI maintained control over whom to hire to conduct interrogations, determined whom and how to discipline CACI interrogators, and enjoyed discretion on how to conduct interrogations.

### 1.  The CACI Contract and Military Regulations Required CACI to Control and Supervise Its Employees

The District Court noted that the operative contract provisions of Delivery Orders 35 and 71 provide that CACI employees would "perform under the direction and control of the unit's MI chain of command or Brigade S2, as determined by the supported command."  A1391.

However, the District Court ignored the Statement of Work *annexed* to these same Delivery Orders that required CACI "to assist, supervise, coordinate, and monitor all aspects of interrogation activities," and stated that "[t]he Contractor is responsible for providing supervision for all contractor personnel."  A798-800 ¶¶ 3, 5.  Thus, CACI maintained significant discretion to plan and execute interrogations and was required to evaluate and hire managers who had knowledge

11

of intelligence gathering sufficient to independently supervise CACI interrogators. *See id.*; A811-12 ¶ 4.a.

Civilian control over contractor-employees was also required by governing military regulations. According to the Army Field Manual, "Commanders do not have direct control over contractors or their employees . . . ; only contractors manage, supervise, and give directions to their employees." *See* U.S. Dep't of the Army, *Field Manual 3-100.21 (100-21): Contractors on the Battlefield*, ¶ 1-22 (Jan. 2003); *see also id.* ¶ 4-19 ("the contractor is solely responsible to manage its employees and operations").

## 2. CACI Established Its Own Reporting Lines and Control Structure

The District Court concluded that CACI leadership—the Site Leads at Abu Ghraib—"primarily performed administrative duties and made no operational decisions," based on a single piece of evidence cited by CACI. A1390 (citing A258 ¶ 8). But it ignored a wealth of evidence demonstrating that CACI reserved either parallel or exclusive control over its own employees and had significant discretion to develop, supervise, and administer formal interrogation plans.

First, CACI interrogators were not subject to military discipline or the chain of command:

> Contract employees are disciplined by the contractor through
> the terms of the employee and employer relationship. . . .
> Commanders have no penal authority to compel contractor

12

8198372v.6

personnel to perform their duties or to punish any acts of misconduct.

A1047 ¶ 15.[4]  As a result, CACI personnel took orders from CACI Site Leads. A891, at 185:1-14.  The District Court did not address evidence demonstrating that CACI officials were empowered to investigate allegations of prisoner abuse and exclusively authorized to discipline violators among its employees without consulting the military.  A863-65, at 142:23-144:6; A1020, at 182:4-12; A951-53, at 172:12-174:6; A964, at 185:6-17; A978-79, at 223:3-224:22; A1034, at 50:4-11; A1037, at 88:13-17.

Second, CACI's control of its employees was not limited to administrative matters, but extended to interrogations.  CACI supervisors monitored how CACI employees conducted interrogations, including observing interrogations and reviewing reports and interrogation notes.  A947-48, at 106:2-107:6; A959-60, at 180:22-181:12; A962-64, at 183:9-185:4; A963-65, at 142:23-144:6; A866-67, at 151:23-152:13; A879, at 164:7-22.  The CACI Site Lead at Abu Ghraib had full access to information and meetings concerning the conduct of interrogations.  A872-73, at 157:2-158:19.  CACI interrogators consulted the Site Lead prior to conducting interrogations, and independently prepared interrogation plans, which

---

[4] *See* Army Field Manual, *supra*, at ¶ 4-2 ("Contractor management does not flow through the standard Army chain of command.").

13

were reviewed and sometimes revised by the Site Lead.  A876, at 161:4-14; A879, at 164:7-22; A913-15, at 325:12-327:4.

Third, CACI employees in Iraq were subject to CACI's corporate Code of Conduct.  A822-23, at 64:20-65:24.  The Code of Conduct reserved to CACI the right "to be the sole judge of the consistency and performance of employees," "to determine the means and name in which the business is to be conducted, including assignment of employees," and "to direct, supervise, control, and when it deems appropriate, discipline the work force."  A894-95, at 192:15-193:3; A923-24.

Fourth, CACI maintained reporting lines separate from and independent of the military chain of command.  A845-48, at 90:6-93:23.  CACI "always put someone representing CACI in charge" at any location with CACI employees.  A957, at 178:13-14; A909-10, at 234:12-235:21 ("Somebody had to be in charge" from CACI at each site in which CACI provided interrogators); A1032-33, at 48:23-49:7.  This structure included a Site Lead (an on-the-ground supervisor) and a country manager, both with managerial responsibilities and with a duty to report back to the company.  *See* A825, at 67:3-9; A833, at 117:9-19; A845-48, at 90:18-93:23; A851-52, at 101:15-102:14; A855-56, at 109:19-110:6.  A CACI executive from Virginia also visited the site at least 17 times to ensure that CACI employees were performing properly.  A938, at 67:2-24; A941-92, at 78:5-79:1; A957, at 178:11-18; A833-34, at 117:9-118:7.  CACI management sent daily reports up the

14

CACI hierarchy "so they could keep a grip on what was happening" and did not

share the reports with the military contracting officer representative. A1023, at

188:15-22.

One CACI executive testified that CACI employees could challenge military

direction: if "they thought it was bad direction, they would take it to the Site Lead,

and the Site Lead would work with the customer, get it worked out." A944, at

90:14-19. CACI personnel were required to bring *all* issues to CACI management,

not to their military supervisors. A967-71, at 200:16-204:14. Finally, unlike

soldiers, CACI personnel could leave Iraq at will, A898-99, at 223:19-224:2;

A1012-13, at 40:11-41:3; A1016-17, at 140:1-141:5, and at least one did so after

being threatened by his co-workers for reporting their participation in prisoner

abuse. A1055-63, at 54:7-62:3.

The District Court did not mention any of this evidence.

### C.    Absence of Control of CACI Personnel Outside of Formal Interrogations

The District Court did not consider the undisputed evidence addressing the

extent to which "military personnel actually exercised control over CACI

employees in their performance of their interrogation functions," particularly

"outside the context of required interrogations." *Al Shimari II*, 758 F.3d at 535,

536.

1.    **The Command Vacuum at Abu Ghraib Precluded Military Control over CACI**

Military officials did not personally supervise CACI interrogators during the conduct of interrogations.  *See, e.g.*, A983 ¶ 5; A1160 ¶¶ 5-8.  They relied on CACI to keep track of its own employees and to monitor the propriety of their conduct, and military leaders were not always aware of which CACI interrogators were present at Abu Ghraib.  A998, at 70:11-14.  There was no formal process or system for military monitoring of contractor performance.  A1001-02, at 100:22-101:15.

Testimony from MI personnel confirms that the military did not supervise CACI interrogators.  Col. Thomas Pappas—the highest-ranking military intelligence officer at Abu Ghraib and a witness on whose declaration the District Court heavily relied—previously testified that ██████████████████████ ████████████████████████████████████████ ████████████████████████.  A1165-66, at 50:20-51:15.  Captain Carolyn Wood, the Officer in Charge of the Joint Interrogation and Debriefing Center, also testified that ████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████.  A1068-69; A700.  Sergeant Teresa Adams, a military intelligence section leader, testified that ████████

██████████████████████████████████████████████████

████████ A1076.  Colonel William Brady has also testified that ████████████

██████████████████████████████████████████████████

████████████████████████.  A994-95, at 62:1-63:24; A1001-02, at 100:22-

101:13.

Multiple investigative reports by senior military commanders concluded that

the abuses at Abu Ghraib were in significant part caused by a military command

vacuum that existed at the site in 2003-04.  The command vacuum at Abu Ghraib

resulted in a lack of supervision of CACI interrogators that enabled the "sadistic,

blatant, wanton criminal abuses," A95-96 ¶ 78 (quoting Taguba Report), to occur.

The Fay Reports and the report of Lt. Gen. Anthony R. Jones ("Jones Report")—

which the District Court ignored[5]—could not be clearer:

- "The leaders from 205th [Military Intelligence ("MI")] and 800th MP Brigades located at Abu Ghraib or with supervision over Abu Ghraib, failed to supervise subordinates or provide direct oversight of this important mission. The lack of command presence, particularly at night, was clear."  A738 ¶ 8(f)(1).

- "At Abu Ghraib, the lack of an MI commander and chain of command precluded the coordination needed for effective operations. . . . At Abu Ghraib, the delineation of responsibilities seems to have been blurred when military police Soldiers, untrained in interrogation operations, were used to enable interrogations."  A734 ¶ 7(a)(3).

---

[5] These reports and the Taguba Report are admissible pursuant to Fed. R. Evid. 803(8).

8198372v.6

- "At Abu Ghraib, interrogation operations were also plagued by a lack of an organizational chain of command presence and by a lack of proper actions to establish standards and training by the senior leaders present."  A738 ¶ 8(f).

- "In addition to individual criminal propensities, leadership failures and, multiple policies, many other factors contributed to the abuses occurring at Abu Ghraib, including: . . . [f]ailure to effectively screen, certify, and then integrate contractor interrogators/analysts/linguists. . . ."  A730-31 ¶ 1(d)(6).

- "The general policy of not contracting for intelligence functions and services was designed in part to avoid many of the problems that eventually developed at Abu Ghraib, i.e., lack of oversight to insure that intelligence operations continued to fall within the law and the authorized chain of command, as well as the government's ability to oversee contract operations."  A703.

- "It is apparent that there was no credible exercise of appropriate oversight of contract performance at Abu Ghraib."  A706.

As Warren Hernandez, a military analyst at Abu Ghraib, testified: 

████████████████████████████████████████████████████

████████████████  A1172-73, at 36:16-37:10.

The District Court did not mention any of this evidence.

### 2.    CACI Interrogators Controlled the MPs

As a result of the command vacuum, CACI interrogators were viewed by MPs as superiors and exercised *de facto* control over MPs.

Captain Wood gave a statement that CACI "supervised" MPs.  A706.  One former MP testified that ███████████████████████████████████████

███████████████████████████████████████████████████

18

████████████████████████████████████████████

A1086.  Another MP, then Sgt. Ivan Frederick III, testified in this case that ████

████████████████████████████████████████████

████████████████████████████████  A517-18, at 45:15-46:4;

A522, at 66:22-25; A526, at 70:15-18.  Frederick testified that he took orders from

CACI interrogators, A548, at 111:10-14, and that ███████████████████

████████████████████████████████████████████

████████████████████  A558-59, at 131:3-132:25.  Other MPs, including

then Cpl. Charles Graner, also testified that ██████████████████████

████████████████████████████████████████████

████████  A591, at 40:20-24; A594, at 43:14-19; A1092, at 20:10-16.

### 3.    CACI Employees Directed the Abuse of Prisoners

Ivan Frederick, who commanded MPs guarding detainees in Tier 1A when

the abuses at issue occurred, testified in his deposition that ████████████

████████████████████████████████████████████

████████████████████  A91¶ 23; A97 ¶ 85; *see also* A530-32, at

79:11-82:9; A535-36, at 84:6-85:8; A541-43, at 90:19-92:7.  Charles Graner, who

like Frederick was convicted in a court martial for abusing detainees, previously

testified to the Criminal Investigation Division ("CID") that ██████████████

████████████████████████████████████████

████████ A100 ¶ 100; A106 ¶ 126; *see also* A581-82, at 24:5-25:11; A586-89, at 35:17-38:15; A600-01, at 49:22-50:11. They both testified that CACI personnel ordered them to perpetrate specific abuses that match the abuses the Plaintiffs suffered. A100-01 ¶¶ 100, 111; A103 ¶ 116; A106 ¶ 126; *see also* A607-09; A612-18; A635-37, at 63:2-65:16; A640, at 68:2-18; A644-46, at 81:18-83:11; A652-55, at 89:9-92:19; A659-61, at 101:5-103:3.  Plaintiff Al-Ejaili identified Graner and Frederick as individuals who guarded him at the Hard Site.  A635-36, at 63:8-64:7; A652, at 89:13-15.  In his deposition, Al-Ejaili identified a photograph of himself standing in a pool of his own vomit after being mistreated by Graner.  A635-37, at 63:2-65:16; A640, at 68:2-18; *see also* A764.  The other Plaintiffs—Al Shimari, Al Zuba'e and Rashid—also identified Frederick and Graner as men who hurt the detainees often and specifically mistreated them. A105 ¶¶ 121-122; A107-08 ¶¶ 132, 134-135; *see also* A767-72; A775-81; A786-91.

There is no evidence that any military commanders procured or authorized this detainee abuse at the Hard Site during the relevant time frame.

In addition, multiple military investigations concluded that CACI employees were complicit in the abuse of detainees.  Maj. Gen. Taguba identified CACI employee Stefanowicz as responsible for abuses at Abu Ghraib and determined that Stefanowicz had lied to him during the investigation.  A97-98 ¶¶ 83, 87; *see*

20

*also* A679 ¶ 11.  Col. Henry Nelson, a psychologist who assisted Gen. Taguba during his investigation, concluded that the abuse resulted from a "collaboration" and "conspiracy of silence" between the MPs and interrogators, including CACI personnel.  A97 ¶ 84; *see also* A680-85.  In a separate investigation, Maj. Gen. George R. Fay found that CACI employees had "responsibility or complicity in the abuses that occurred at Abu Ghraib."  A96 ¶ 81; *see also* A694. The Fay Report identified at least five unidentified CACI employees as having responsibility or complicity, three of whom CACI admitted to be CACI employees Stefanowicz, Johnson, and Tim Dugan.  A709; A712; A715; A718-19; A760-61.

Evidence in the record also indicates that the formal interrogation structure at Abu Ghraib does not reflect what was actually happening there.  ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████ A105 ¶ 124; *see also* A742; A752-54, at 18:8-20:5.

The District Court did not mention any of this evidence.

### D. Testimony of CACI's Military Officer Declarants on which the District Court Relied Is Irrelevant to the "Facts on the Ground" and Contradicted by Their Prior Inconsistent Statements and Admitted Lack of Personal Knowledge

The District Court relied heavily on declarations of Cols. Brady and Pappas, submitted by CACI, describing them as "convincing as to who maintained the chain of command at Abu Ghraib—the military."  A1390-91. To the contrary,

those declarations are limited to the officers' characterizations of the *official* structure that, on paper, they believed to govern formal interrogations. They say nothing about the "facts on the ground" inquiry this Court deemed central to resolving PQD—nor could they given the well documented lack of military oversight that led to the abuse of detainees in Tier 1A.

The District Court failed to consider that both declarants previously testified to a lack of personal knowledge of the details of actual interrogation and detainee treatment, made prior inconsistent statements, and offered testimony which conflicts with testimony of other witnesses.

For example, in his declaration Col. Pappas states that CACI "interrogators were fully integrated . . . and operationally indistinguishable from their military counterparts." A258 ¶ 8. But in a prior proceeding he testified ████████████ ████████████████████████████████████████:



A1165-66, at 50:20-51:15.

Similarly, in his declaration, Col. Brady swears: "I also reviewed and approved changes in status for CACI PT screeners in those cases where a screener's duties were changed to instead perform work as an interrogator." A253

22

¶ 3.  However, in his April 17, 2007 deposition—six years prior and much closer in time to the events at issue in this case—he testified:



A990, at 25:7-10.  In his declaration, Col. Brady swears:

> During all relevant times, the civilian interrogators provided by CACI PT in support of the United States Army's mission at the theater interrogation site were under the supervision of military personnel from the military unit to which they were assigned to support under contract.

A253 ¶ 4.  But in his deposition, Col. Brady testified:

 A994-95, at 62:1-63:24.

The District Court's decision accepts the declarations submitted by CACI at face value and reflects no analysis of their competency, credibility, or accuracy in light of evidence of inconsistency, internal contradiction, and contradiction by the findings from Fay-Jones and Taguba investigations.

### E.   The Conduct Alleged by Plaintiffs Was Never Authorized or Was Expressly Prohibited by the Military

CACI employees were contractually obliged to act "IAW [in accordance with] Department of Defense, US Civil Code, and International Regulations."  *See* A798 ¶ 4; *see also* A830, at 87:22-24 ("CACI promised to provide the government only services rendered in a lawful manner").  Army Regulations prohibit "cruel

23

and degrading treatment," A1106 § 1-5(b), (c); any form of "physical torture or moral coercion" to obtain information, A1109 § 5-1(a)(1); and "any other measure of brutality," A1109 § 5-1(a)(6)(a) (incorporating Geneva Convention Relative to the Protection of Civilian Persons in Time of War arts. 3, 31, 32, Aug. 12, 1949, 75 U.N.T.S. 287); *see also* A1116-17; A1120-23; A1125.

Federal statutes criminalize such acts. *See* War Crimes Act, 18 U.S.C. § 2441 (defining "war crimes" as any "grave breach" under the Geneva Conventions of 1949, including "torture" and "cruel or inhuman treatment"); Torture Statute, 18 U.S.C. §§ 2340-2340B (criminalizing as torture "an act . . . specifically intended to inflict severe physical or mental pain or suffering . . ."); Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350, note § 3(b) (defining "torture" and providing for damages).

The Geneva Conventions similarly prohibit torture and CIDT, and serious violations of the conventions constitute war crimes. *See* Geneva Convention Relative to the Protection of Civilian Persons in Time of War, arts. 3, 31, 32, 147, Aug. 12, 1949, 75 U.N.T.S. 287 [hereinafter "Fourth Geneva Convention"]; Geneva Convention Relative to the Treatment of Prisoners of War, arts. 3, 13, 17, 130, Aug. 12, 1949, 75 U.N.T.S. 135 [hereinafter "Third Geneva Convention"].

All CACI intelligence staff were briefed on the Geneva Convention, A857-58, at 111:16-112:4, and ███████████████████████████████

24

███████████████████████ *See* A1148-57.  An order for a CACI employee to treat a detainee "in violation of the Geneva Conventions" would have been outside the scope of the CACI contract.  A830, at 87:10-20.

Two separate IROEs were issued at Abu Ghraib during the relevant time period.  While the first, issued on September 14, 2003, authorized interrogation techniques such as the use of military working dogs, stress positions and sleep management under certain circumstances; the second, issued on October 12, 2003—before three Plaintiffs were brought to Abu Ghraib—removed authorization for those and certain other techniques.  *Compare* A1132 ¶¶ Y, Z, CC, *with* A1137-38.  At all times the Geneva Conventions applied in Iraq—a fact cited in the cover letter to IROE I.  And neither IROE ever authorized beatings, electric shocks, deprivation of food and water, sexual abuse, unmuzzled dogs, the stripping naked of detainees or other humiliations inflicted on Plaintiffs.  *See generally* A1129-32; A1137-38.

## SUMMARY OF ARGUMENT

In seeking accountability for their torture and abuse, Plaintiffs do not question military law or policy; they aim to enforce it.  As President Bush, Defense Secretary Rumsfeld, and Congress recognized, such abuses were never authorized by the military at Abu Ghraib.  Federal domestic law (enacted through, among

8198372v.6

other law, the Torture Statute, the Convention Against Torture ("CAT"),[6] and the War Crimes Act) and military law and policy (enacted through the Army Field Manual and adoption of the Geneva Conventions) all prohibit the torture and other mistreatment suffered by Plaintiffs. Plaintiffs' invocation of these specific, universal and obligatory norms through a recognized basis for jurisdiction—the ATS—compels a judicial remedy. Yet, in spite of these categorical prohibitions, the District Court's decision abdicates the judiciary's obligation to ensure accountability for torture and abuse committed by Americans. It should not stand.

1.    The District Court adopted an overbroad interpretation of the PQD that both misunderstands the nature of Plaintiffs' claims and extends the doctrine beyond constitutional boundaries set by the Supreme Court and by *Taylor*. This is not a negligence case. Plaintiffs do not challenge the reasonableness of discretionary military decisions as in *Taylor* and related contractor cases, which can be beyond judicial competence. They challenge the *illegality* of CACI's conduct, which simply requires the Court to compare Plaintiffs' evidence against well-established statutory-law and common-law standards governing torture, war crimes and CIDT—an application of law-to-facts that is a "familiar judicial exercise." *Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1427 (2012). Neither the

---

[6] UN General Assembly, *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, 10 December 1984, United Nations, Treaty Series, vol. 1465, p. 85.

8198372v.6

military nor President has discretion to authorize what is illegal, and there is no evidence or contention by CACI that the military authorized (against prevailing law) the abuses Plaintiffs suffered.  It is emphatically the judiciary's duty to adjudicate these statutory and common law claims.

2.    Because the jurisdictional facts related to the PQD, *i.e.* the level of military control over CACI interrogators, are intertwined with the facts necessary to Plaintiffs' case on the merits, clear Fourth Circuit precedent required the District Court to defer a 12(b)(1)-stage judgment on these intertwined facts until trial. Because nothing in this Court's remand instructions suggested that the District Court should forgo this requirement, the District Court committed reversible error.

3.    Even assuming the District Court properly reached the jurisdictional facts, in applying *Taylor* Prong One, it failed in several ways to undertake the "discriminating analysis" of the factual record directed by this Court on remand.

a.    The District Court ignored this Court's instruction to examine the level of military control *outside* of the formal interrogation process, *Al Shimari II*, 758 F.3d at 537.  Plaintiffs' substantial, unrebutted evidence on this score shows there was a military "command vacuum" at the Hard Site, which permitted CACI personnel to assume positions of authority and order low-level MPs to abuse detainees.  This evidence is dispositive in foreclosing any notion of plenary

27

military control, and justifies this Court to reject the PQD defense without further remand.

        b.     The District Court likewise failed to consider ample evidence introduced by Plaintiffs even addressing the formal level of control.  The level of supervision, control and discipline reserved to CACI under the contract, and the discretion CACI maintained to conduct interrogations is unlike the absolute control the military exhibited over a fuel convoy in *Carmichael* that *Taylor* states would meet Prong One, and is akin to *Taylor*, *Harris*, and *McMahon*, where courts found an absence of plenary control.

        3.     The District Court analysis of *Taylor* Prong Two was legal error. Plaintiffs' invocation of statutory prohibitions and universally recognized common law norms means the court need only resolve questions of *law*, not questions of military policy—sensitive or otherwise.  It also means there are judicially manageable standards to resolve these claims.  The District Court's belief that an absence of "lucidness" regarding the precise contours of the torts renders a court incompetent to decide the claims (A1404) represents a worrisome abdication of the judicial role.

## STANDARD OF REVIEW

     This appeal raises issues of law that this Court reviews *de novo* as well as, potentially, issues reviewed for clear error.  *See United States ex rel. Vuyyuru v.*

28

8198372v.6

*Jadhav*, 555 F.3d 337, 348 (4th Cir. 2009) ("We review a district court's jurisdictional findings of fact on any issues that are not intertwined with the facts central to the merits of the plaintiff's claims under the clearly erroneous standard of review and any legal conclusions flowing therefrom de novo. If the jurisdictional facts are so intertwined with the facts upon which the ultimate issues on the merits must be resolved, the entire factual dispute is appropriately resolved only by a proceeding on the merits." (citations and quotation marks omitted)).

Where, as in this case, a district court is complying with a mandate from the Court of Appeals on remand, the "mandate rule" requires that a district court "scrupulously and fully carr[y] out" that mandate. *S. Atl. Ltd. P'ship of Tenn., L.P. v. Riese*, 356 F.3d 576, 583 (4th Cir. 2004). Whether the district court carried out the Court's mandate is subject to *de novo* review. *Id*. at 583.

Accordingly, whether the District Court should have decided the jurisdictional facts that are intertwined with the merits should be reviewed *de novo*. If this Court decides that the District Court properly reached those factual disputes, the factual findings are reviewed for clear error, but the legal conclusion the court drew from them—that this case is barred by the PQD or that Plaintiffs' claims would implicate sensitive military judgments or lack judicially manageable standards —is reviewed *de novo* as a conclusion of law.

29

## ARGUMENT

I.   **THE DISTRICT COURT'S EXPANSIVE INTERPRETATION OF THE POLITICAL QUESTION DOCTRINE EXCEEDS PERMISSIBLE BOUNDS SET BY *TAYLOR* AND SUPREME COURT PRECEDENT AND ABDICATES ITS OBLIGATION TO REVIEW THE STATUTORY CLAIMS AND INTENTIONAL TORTS ASSERTED IN THIS CASE**

As the Supreme Court's most recent pronouncement emphasized, the PQD represents a "narrow exception" to the judiciary's constitutional duty to decide cases and controversies, *Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1427 (2012)—a duty the court must carry out even in disputes it would otherwise "gladly avoid." *Cohens v. Virginia*, 19 U.S. (6 Wheat) 264, 404 (1821). Indeed, in the fifty years since *Baker v. Carr*, 369 U.S. 162 (1962) and despite numerous invocations, the Supreme Court has ordered a case dismissed on political question grounds only twice. *See El-Shifa Pharm. Co. v. United States*, 607 F.3d 836, 856 (D.C. Cir. 2010) (Kavanaugh, J., concurring) (citing *Walter Nixon v. United States*, 506 U.S. 224 (1993); *Gilligan v. Morgan*, 413 U.S. 1 (1973)).

Traditionally, the two most important factors in evaluating the possibility of a political question are whether there is: (1) a "textually demonstrable constitutional commitment of the issue to a coordinate political department"; or (2) a "lack of judicially discoverable and manageable standards for resolving it." *Zivotofsky*, 132 S. Ct. at 1427 (quoting *Nixon*, 506 U.S. at 228). Because the doctrine is ultimately a function of separation of powers, *Baker*, 369 U.S. at 217,

30

these two factors are designed to capture the rare instance where, despite Article III, a court lacks constitutional authority to make a decision or institutional competence to resolve the questions necessary to the dispute. *See Zivotofsky*, 132 S. Ct. at 1431-32 (Sotomayor, J., concurring).

Because private military contractors are corporate actors and not a "coordinate political branch" of government, the Fourth Circuit recently adapted the traditional *Baker* standards into the two-part *Taylor* test. *See In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 334 (4th Cir. 2014). In such cases, the PQD will apply if a contractor (1) is under the "plenary" or "direct" control of the military or (2) where adjudication of the merits "would require the judiciary to question actual, sensitive judgments made by the military." *See Al Shimari II*, 758 F.3d at 533-34 (quoting *Taylor*).

Yet, given the constitutional dimension to the PQD, which under Article III requires that courts adjudicate bona fide cases and controversies, interpretation or application of the two *Taylor* factors should not exceed the doctrine's "narrow" scope as set forth by the Supreme Court in *Baker* and its progeny.

As Plaintiffs detail below, the factual record and the law does not support a finding of a political question under *Taylor*'s two-prong test, particularly in the manner directed by *Al Shimari II*. At the threshold, however, the District Court's interpretation of the *Taylor* test expands the PQD beyond constitutionally

31

acceptable boundaries and represents a resignation of judicial power in circumstances that, the Supreme Court instructs, present the most compelling bases for judicial review: evaluating the *legality* of a party's *intentional* actions, in asserted violation of *individual rights*, as directed by *congressionally*-enacted standards.

Plain evidence that the District Court did not undertake the "discriminating analysis" mandated by this Court, *Al Shimari II*, 758 F.3d at 533, is its nearly wholesale adoption of the categorical military political question barrier set forth by Judge Niemeyer in his *dissenting* opinion in *Al Shimari I* (which garnered three votes of the *en banc* Court) and his earlier panel decision that was vacated by the full court. According to the District Court and Judge Niemeyer, this case necessarily requires the court to impose "state tort duties onto an active war zone, raising a broad array of interferences by the judiciary into the military functions," A1395 (quoting *Al Shimari I*, 679 F.3d at 268 (Niemeyer, J., dissenting)), and would require courts to question what techniques were "morally appropriate [] and what could be justified by military necessity," whether it was appropriate for "the gloves [to] com[e] off," and would otherwise "enmesh the court into military strategies, decisions and activities." A1395-96; *Al Shimari v. CACI Intern., Inc.*, 658 F.3d 413, 424-25 (Niemeyer, J.), *vacated by Al Shimari I* (en banc).

8198372v.6

In adopting this view wholesale, the District Court misapplied the law and misapprehended Plaintiffs' claims. First, had Judge Niemeyer's dissenting position been controlling, this Court in *Al Shimari II* would not have chosen to remand with instructions for detailed factual evaluation; the position is expansive enough to have mandated dismissal under PQD on the record then on appeal. Thus, the District Court's embrace of this categorical position (as well as the failure to consider Plaintiffs' factual presentation, *see infra* Section III), signals an impatience with the discriminating inquiry this Court demanded.

The Supreme Court has repeatedly held that, contrary to the District Court's present view, military decisions affecting individual rights can be subject to judicial review for their legality. *See Boumediene v. Bush*, 553 U.S. 723, 783 (2008) (rejecting sufficiency of military administrative hearings and ordering "meaningful" judicial review of detention decisions in Guantanamo); *Hamdan v. Rumsfeld,* 548 U.S. 557, 567 (2006) (rejecting legality of military commissions under domestic and international law and ordering military's compliance with Article 3 of Geneva Conventions). As the District Court itself previously recognized in its 2009 decision rejecting this expansive view of the PQD, numerous Supreme Court cases permit "private plaintiffs . . . to bring tort actions for wartime injuries." *Al Shimari*, 657 F. Supp. 2d at 711(citing cases), because "matters are not beyond the reach of the judiciary simply because they touch upon

33

war." *Id.* at 713 (citing cases); *see also Little v. Barreme*, 6 U.S. (2 Cranch) 170 (1804) (finding U.S. Navy Captain liable for unlawfully seizing ship during wartime and rejecting Presidential order as a defense); *Mitchell v. Harmony*, 54 U.S. (12 How) 115 (1851) (soldier liable, despite commander's order, for wrongfully seizing Mexican citizen's goods during Mexican-American war); *The Paquette Habana*, 175 U.S. 677 (1900).[7]

The District Court's characterization of Plaintiffs' claims also "misunderstands the issue presented." *Zivotofsky*, 132 S. Ct. at 1427. To resolve Plaintiffs' claims, the court in no way needs to opine on the *wisdom* (or "military necessity") of any interrogation techniques or any other lawful, discretionary military decisions, as might have been at issue in adjudicating the negligence claims at issue in *Taylor*, *Carmichael* and *Harris*, the reasonableness of which the judiciary may have no competence to review. *Compare Baker*, 369 U.S. at 217 (a third prudential PQD factor is the "impossibility of deciding without an initial *policy* determination of a kind clearly for nonjudicial discretion") (emphasis added).

---

[7] For this reason, the Court may wish to ensure that the *Taylor* Two-Prong test is applied in the conjunctive, not disjunctive. If the lawfulness of military decisions themselves may be subject to judicial review, *see Gilligan v. Morgan*, 413 U.S. 1, 11-12 (1973), it cannot be that, merely because a contractor's decision was fully controlled by the military, judicial review must be precluded. *See Al Shimari II*, 758 F.3d at 533 (quoting *Taylor*, 658 F.3d at 411).

8198372v.6

In fundamental contrast, the Court here is called on to assess the *legality* of CACI's intentional conduct in directing and conspiring in the abuse of detainees against established positive-law standards (conduct that a military tribunal adjudicated as unlawful in several courts martial when engaged in by CACI's co-conspirators). *See Hamdi v. Rumsfeld*, 542 U.S. 507, 535-36 (2004) (emphasizing distinction between questioning "core strategic matters of warmaking," and questions involving "individual liberties," for which the Constitution "most assuredly envisions a role for all three branches"); *see also Al Shimari*, 657 F. Supp. 2d at 710 (previously recognizing that where claims turn on a "derogation of United States and international law" they are "entirely justiciable").

As detailed below, in addition to the "universal" and "obligatory" nature of these torts, *Congress* has determined that torture and abuse are *illegal* via the Torture Statute, 18 U.S.C. §2340, and the War Crimes Act, 18 U.S.C. § 2441, and has made that wrongdoing justiciable in the ATS. Like *Zivotofsky*—in which the State Department unsuccessfully argued the judiciary would be enmeshed in sensitive and judicially unmanageable diplomatic questions about the status of Jerusalem—the court here need only compare the conduct alleged against the standards set forth by congressional statute and universal international law, *i.e.* "enforce a specific statutory right," which is a "familiar judicial exercise." *Zivotofsky*, 132 S. Ct. at 1427.

35

8198372v.6

## II.   THE DISTRICT COURT ERRED BY MAKING FACTUAL FINDINGS ON THE MERITS OF PLAINTIFFS' CASE

A district court may not make factual findings to resolve a motion to dismiss under rule 12(b)(1) when those facts are intertwined with the merits and in dispute. *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009).  In such a case, "the trial court should ordinarily assume jurisdiction and proceed to the intertwined merits issues," by deferring resolution of factual questions to the trier of fact. *Id.*  Where facts are intertwined, the dispositive jurisdictional facts can only be resolved in the same fashion as facts relevant to the merits—by summary judgment if they are not subject to dispute and at trial if they are. *See United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 348 (4th Cir. 2009); *Richmond, F. & P. R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991); *Adams v. Bain*, 697 F.2d 1213, 1219-20 (4th Cir. 1982).[8]  Even where the jurisdictional and merits questions are "not identical," a court should not dismiss an action where the two are "so closely related that the jurisdictional issue is not suited for resolution in the context of a motion to dismiss." *United States v. North Carolina*, 180 F.3d 574, 581 (4th Cir. 1999).

---

[8] The only exception, not applicable here, is when the jurisdictional allegations are immaterial, made solely for the purpose of obtaining jurisdiction, or are unsubstantial and frivolous.  *Kerns*, 585 F.3d at 193.

The issue of who was in control at Abu Ghraib is central to both the PQD and the merits of Plaintiffs' case, and the facts relevant to this issue are either wholly in Plaintiffs' favor, or at least in dispute.

First, Plaintiffs cite evidence demonstrating that there was a command vacuum at Abu Ghraib, resulting in a lack of oversight of CACI by military officials and CACI's control of the MPs.  *See supra* Statement of Facts section C. For that reason, the PQD does not apply under prong one of *Taylor*.

At the same time, facts regarding this command vacuum and consequential *de facto* control by CACI are likewise central to Plaintiffs' case on the merits.  As detailed in Plaintiffs' complaint, military officials' lack of control explains how CACI was able to order, and otherwise conspire with, MPs to carry out the abuses Plaintiffs suffered:

> There was virtually no supervision of the MPs at the Hard Site by superiors in the military chain of command.  Instead, the interrogators took over.  As Frederick has testified under oath, civilian interrogators employed by CACI PT filled the vacuum by assuming *de facto* positions of authority…. As authority figures, they created and set in place the extreme and abusive conditions in which detainees were to be confined at the Hard Site location where Plaintiffs were detained.  It was those torturous conditions ordered by CACI PT employees to which Plaintiffs were subjected at the Hard Site.

8198372v.6

A143-44 ¶ 18.   Those facts give rise to Plaintiffs' conspiracy and aiding and abetting claims.  A88-89 ¶ 18; A99-101 ¶¶ 96-107; A113-14 ¶ 158; A125-29 ¶¶ 219, 222, 229, 237, 240, 248, 256, 259.[9]

Despite this factual interdependence, the District Court erred in not following the Fourth Circuit's requirement that it defer adjudication of the facts on the merits until after the motion-to-dismiss stage, where Plaintiffs would have the benefit of the necessary procedural protections associated with such a merits decision.

First, the Court erroneously concluded that "the Fourth Circuit has clearly instructed the Court to decide the issue of direct control at this juncture," quoting this Court's remand instructions.  A1392.  Yet, this Court's remand of the case "for further consideration" to "reexamine" the factual record, *Al Shimari II*, 758 F.3d at 536-37, did not carry with it a command to ignore governing Fourth Circuit precedent; that extant precedent instructs district courts on how to provide for resolution of jurisdictional facts where they are intertwined with the merits.

---

[9] The District Court's treatment of the Pappas and Brady declarations highlights risks of making findings of disputed facts on a motion to dismiss.  Despite the clear contradiction between their prior sworn testimony and the declarations that they provided to CACI in this litigation, *see supra* Statement of Facts section D, and the irregular *ex parte* manner in which CACI obtained those declarations, *see* A1095-96; A1098-99, the District Court credited both declarations without explanation. In a trial on the merits, Plaintiffs would have the opportunity to cross-examine the witnesses on these inconsistencies, and the jury would have the opportunity to assess the credibility of their responses.

8198372v.6

Second, the District Court distinguished the authority cited by Plaintiffs on the ground that those cases did not specifically involve the PQD. A1392. The court did not explain why a PQD jurisdictional inquiry under 12(b)(1) should be exempt from the general rule governing inquiries under 12(b)(1). Under that rule, deciding jurisdictional facts, if they are intertwined with the merits in *any* 12(b)(1) motion, represents an indirect attack on the merits of a plaintiff's claims, entitling a plaintiff to the procedural safeguards associated with decisions taken on the merits, including inferences in its favor and resolution of disputed facts by a trier-of-fact. *See Kerns*, 585 F.3d at 193, 195; *Vuyyuru*, 555 F.3d at 348.

Third, the District Court also misinterpreted this Court's teachings in *Kerns* to authorize courts to make a merits determination on a rule 12(b)(1) motion so long as it comes after discovery. While *Kerns* happened to involve a case in which no discovery had taken place on the jurisdictional facts, the legal rule of that case is not so limited. *Kerns* reinforces the broader "general rule" in the Fourth Circuit that "[a] District Court should assume jurisdiction and assess the merits of the claim when the relevant facts—for jurisdictional and merits purposes—are inextricably intertwined." 585 F.3d at 193, 195; *see also id.* at 195 (a plaintiff facing an indirect attack on the merits "deserves greater procedural protection than that afforded by a typical Rule 12(b)(1) motion").

39

## III. THE DISTRICT COURT'S FINDINGS IN APPLYING THE *TAYLOR* PLENARY CONTROL PRONG ARE CLEARLY ERRONEOUS

Even if it were proper for the District Court to resolve the facts at this juncture, its findings in applying the *Taylor* prongs are clearly erroneous. Findings of fact are clearly erroneous when the entire record demonstrates to the reviewing court that "a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948); *United States v. Hall*, 664 F.3d 456, 462 (4th Cir. 2012). Courts may find clear error where the factual determinations either "are not supported by substantial evidence" or "are against the clear weight of the evidence considered as a whole." *United States v. Martinez-Melgar*, 591 F.3d 733, 738 (4th Cir. 2010). A district court also commits clear error where, as here, it makes factual findings "without properly taking into account substantial evidence to the contrary." *Miller v. Mercy Hospital*, 720 F.2d 356, 361 (4th Cir. 1983). In cases where no trial took place and no credibility evaluations were made, "an extensive review of the District Court's findings . . . is warranted." *Easley v. Cromartie*, 532 U.S. 234, 243 (2001).

### A. Because the District Court Failed to Carry out this Court's Mandate to Examine Military Control Outside of Formal Interrogations, and Because the Record Is Undisputed that No Such Control Existed, this Court Should Affirmatively Conclude that *Taylor* Prong One Has Not Been Satisfied

In applying the facts to *Taylor* Prong One, the District Court *only* analyzed the formal command structure at Abu Ghraib without grappling with the realities

40

on the ground, despite this Court's specific instruction to do so. That failure to abide by the Court's mandate is reversible error. *See Bailey v. Moreno*, 547 Fed. App'x 196, 198 (4th Cir. 2013). And, because the facts are undisputed, this Court should make the conclusive determination that *Taylor* Prong One is not satisfied without remand for another round of factual analysis by the District Court.

Under *Taylor* Prong One, the critical issue is not whether the military "exercised some level of oversight," but whether the military "chose how to carry out these tasks." *Al Shimari II*, 758 F.3d at 534 (quoting *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 339 (4th Cir. 2014)). Where the military was unaware of the contractors' actions or unable to direct how to carry out tasks, as the evidence conclusively demonstrates here, there can be no plenary military control sufficient to satisfy *Taylor*.

Though the District Court made no mention of the voluminous evidence presented by Plaintiffs, the record below makes clear that: (i) regardless of any formal contractual or supervisory arrangements between the military and CACI, there was a military "command vacuum" at Abu Ghraib that left CACI interrogators *actually* unsupervised, *see supra* Statement of Facts section C.1, *see also* Taguba, Fay, and Jones reports, *supra* at Statement of Facts section C.1;[10] (ii)

---

[10] This is evidence the Pappas and Brady declarations—even crediting them fully as the District Court did despite prior inconsistent statements—can in no way contradict.

41

CACI personnel assumed positions of authority at Abu Ghraib and ordered MPs around, *see supra* Statement of Facts section C.2; and (iii) CACI interrogators in fact ordered co-conspirators, such as Frederick and Graner, to abuse detainees at the Hard Site in the manner that Plaintiffs themselves suffered, *see supra* Statement of Facts section C.3.

CACI presented *no evidence* below to contradict these facts. As a result, the Court should find on this undisputed record that the first prong of *Taylor* has not been satisfied.

### B. All of the Additional Record Evidence Regarding CACI's Discretion to Control Employees and Interrogations Demonstrates an Absence of Plenary Military Control

The undisputed evidence demonstrating a military "command vacuum" which permitted CACI employees to control MPs and order abuses is sufficient to support an order of this Court rejecting the PQD. But even the formal relationship between CACI and the military—as evidenced by the contract, *see supra* Statement of Facts section B.1; CACI's authority to supervise and discipline employees, *see supra* Statement of Facts section B.2; and its discretion to conduct interrogations, *see supra* Statement of Facts section B.1—demonstrates an absence of plenary control as contemplated by *Taylor*. Collectively, all of the evidence unambiguously supports reversal.

42

*Taylor* Prong One is not met if the military gave the contractor "discretion to determine the manner in which the contractual duties would be performed." *Al Shimari II*, 758 F.3d at 534. As the cases relied upon by the *Taylor* court demonstrate, even substantial military direction and oversight of contractors is insufficient to demonstrate plenary control. *See Harris v. Kellogg Brown & Root Servs., Inc.*, 724 F.3d 458 (3d Cir. 2013); *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331 (11th Cir. 2007). *Taylor* instructs that *Carmichael v. Kellogg, Brown & Root Service Inc.*, 572 F.3d 1271 (11th Cir. 2009), sets the benchmark for identifying the level of plenary control sufficient to justify PQD—*i.e.* where there is no daylight between contractor and military action.

*Carmichael* involved a soldier's negligence claim against KBR when a truck driven by a KBR employee in a fuel convoy flipped over. *Id.* at 1281-82. The Eleventh Circuit found the military had absolute control over the convoy in theory *and in practice*, down to the scheduling, route, fuel quantity, loading, speed and distance between the vehicles. *Id.* In contrast to the facts here, there was "not the slightest hint in the record suggesting that KBR played even the most minor role in making any of these essential decisions." *Id.* at 1282. In addition, military officials were *present and supervising* the convoy when the conduct giving rise to liability occurred. *See id.* at 1276.

43

8198372v.6

At the same time, *Taylor* found an absence of plenary control based on contractual discretion nearly identical to that afforded to CACI here. In *Taylor*, the contract required KBR to "be responsible for the safety of employees and base camp residents during all contractor operations" and "have exclusive supervisory authority and responsibility over employees." *Id.* at 411. *Compare* CACI Statement of Work, A798-800 ¶ 5 (requiring CACI "to assist, supervise, coordinate, and monitor all aspects of interrogation activities," and stating that "[t]he Contractor is responsible for providing supervision for all contractor personnel.").

The CACI Statement of Work is also like the contract in *Harris*, which the Court found did not support a PQD defense because "the lack of detailed instructions in the work orders and the lack of military involvement in completing authorized work orders" evidenced the contractor's "significant discretion" in completing assignments. 724 F.3d at 467; *see also McMahon*, 502 F.3d at 1361-62.

In this case, as in *Taylor*, *Harris*, and *McMahon*, CACI was contractually obligated to supervise its own employees. The District Court ignored this fact. The District Court also ignored that CACI retained the exclusive right to discipline its own employees, *see supra* Statement of Facts section B.2, an important means of enforcing the ban on abusive treatment that applied to all personnel at Abu

44

Ghraib and relevant to any assessment of whether the military exercised plenary control over CACI personnel.

The District Court relied on the fact that some CACI interrogation plans may have been reviewed by the military, but neglected to address evidence that CACI interrogators were not supervised by members of the military even during formal interrogations, *see supra* Statement of Facts section C.1—a level of discretion nowhere contemplated by *Carmichael.* At the same time, there is no evidence that military commanders ordered or authorized CACI employees or MPs to torture and abuse the detainees, including Plaintiffs, much less how and when to do so. Indeed, any such order would have been unlawful.

While ignoring the benchmarks set out by *Carmichael*, *Harris*, and *Taylor*, the District Court relied heavily on the D.C. Circuit's plainly inapposite decision in *Saleh v. Titan Corp.*, 580 F.3d 1 (D.C. Cir. 2009). The *Saleh* case concerned preemption of state law claims, which, under *Saleh*, occurs simply where the contractor is "integrated" and "performing a common mission" under "ultimate military command." *Id*. at 6-7. This does not equate to the level of plenary or direct control sufficient to take the more dramatic step of removing claims entirely from the court's jurisdiction. *See In re KBR, Inc.*, 925 F. Supp. 2d 752, 763 (D. Md. 2013) ("the military does not exercise 'control' over a contractor simply

8198372v.6

because the military orders a contractor to perform a certain service" (citing

*Taylor,* 658 F.3d at 411)).

More importantly, the *Saleh* court actually *endorsed* factual findings that

ultimately support Plaintiffs' PQD position here:

> [a]lthough CACI's employees were also integrated with
> military personnel and were within the chain of command, ***they
> were nevertheless found to be subject to a "dual chain of
> command"*** because the company retained the power to give
> "advice and feedback" to its employees and because
> interrogators were instructed to report abuses up both the
> company and military chains of command. The CACI site
> manager, moreover, said that he had authority to prohibit
> interrogations inconsistent with the company ethics policy,
> which the district court deemed to be evidence of **"dual
> oversight."**

580 F.3d at 4 (emphasis added).[11]  Accordingly, *Saleh*'s finding that CACI and the

military exercised "dual oversight" over CACI personnel not only undermines the

District Court's determination under *Taylor* Prong One, it also demonstrates that

under *Taylor*, *Harris* and *Carmichael*, the military did not have "plenary control"

over CACI.

It also appears that the District Court confused the identities of the separate

defendants that were before the *Saleh* court.  While the interpreters supplied by

---

[11] Preemption is not before this Court on appeal, but Plaintiffs respectfully disagree
with the D.C. Circuit's holding as a matter of law and fact. *See, e.g.*, A730-31
(Jones Report, blaming Abu Ghraib abuse in part on the "[f]ailure to effectively
screen, certify, and then integrate contractor interrogators/analysts/linguists").

46

another contractor-defendant, Titan, were found to be controlled by the military, the *Saleh* court concluded that the CACI interrogators were not exclusively controlled by the military. *See* 580 F.3d at 4.

## IV. BECAUSE PLAINTIFFS' CLAIMS CHALLENGE THE LEGALITY OF CACI'S INTENTIONAL CONDUCT, NOT THE WISDOM OF ANY DISCRETIONARY MILITARY JUDGMENTS, THEY DO NOT IMPLICATE *TAYLOR* PRONG TWO

Plaintiffs endorse the judgment of Congress and the U.S. military that torture and cruel and inhuman treatment of detainees is unlawful, and seek to enforce these legal prohibitions based on well-established statutory and common law causes of actions; doing so does not require a judgment on the wisdom or efficacy of the military's interrogation methods. The District Court's conclusion to the contrary not only reflects an overbroad interpretation of the PQD, *see supra* Section I, it fundamentally misunderstands the nature of Plaintiffs' claims and the limited judicial role required to resolve them. *See Taylor*, 658 F.3d at 409 (court must "consider how [plaintiffs] might prove [their] claims").

First, the resolution of Plaintiffs' torture, war crimes and CIDT claims requires only a judicial assessment of the *legality* of CACI's conduct, not the *wisdom* of any military decisions or policy choices—a distinction that is fundamental to separation-of-powers. *See El-Shifa*, 607 F.3d at 842 (distinguishing claims that question whether military action was "wise" as nonjusticiable 'policy choice' committed to executive discretion, from claims

47

"presenting purely legal issues such as whether the government had legal authority to act") (internal citations and quotations omitted).  The legality of CACI's actions, in turn, are assessed by comparing Plaintiffs' evidence of misconduct against standards set forth in clear authority such as the Torture Statute, 18 U.S.C. §§ 2340-2340B, War Crimes Act, 18 U.S.C. § 2441, and "specific, universal and obligatory" norms at common law.  *Sosa*, 542 U.S. at 732; 28 U.S.C. § 1350 (ATS).

A case "which calls for applying no more than the traditional rules of statutory construction, and then applying this analysis to the particular set of facts presented below," is never a political question.  *See Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986); *see also El-Shifa*, 607 F.3d at 856 (Kavanaugh, J., concurring in judgment) ("[t]he Supreme Court has never applied the political question doctrine in a case involving alleged *statutory* violations. Never.").  This "familiar judicial exercise" of comparing conduct against statutory law, *Zivotofsky* 132 S. Ct. at 1427, is equally familiar for common law adjudication, where "judicial action [is] governed by standard, by rule." *Veith v. Jubelirer*, 541 U.S. 267, 278 (2004); *see also Zivotofsky*, 132 S. Ct. at 1432 (Sotomayor, J., concurring) (the court's "traditional role" involves application of judicially cognizable standards "to the facts of a concrete case").

48

At the same time, undertaking this limited judicial inquiry will in no way bring the court to evaluate the reasonableness, efficacy or strategy of discretionary military decisions. This case is fundamentally unlike cases like *Taylor*, *Carmichael*, or *Harris*. First, all of those cases involved judicial resolution of *negligence* (or contributory negligence) claims. Adjudication of those cases could thus only occur by evaluating the *reasonableness* of military decisions—*e.g.*, to direct a fuel convoy in an active war zone (*Carmichael*), where to locate military barracks in a high-risk area (*Harris*), or where to locate a power generator (*Taylor*). Because all such decisions are subject to a range of military considerations, data and strategy, the only criteria available to assess the reasonableness of those discretionary choices were military criteria, which are outside judicial competence to evaluate—not legal criteria which are always within the court's role. *See Gilligan v. Morgan*, 413 U.S. 1, 10 (1973) (While "complex, subtle and professional decisions as to the composition, training, equipping and control of a military force are essentially professional military judgments" PQD does not necessarily preclude "accountability in a judicial forum for violations of law for specific, unlawful conduct by military personnel").

*Wu Tien Li-Shou v. United States*, 777 F.3d 175 (4th Cir. 2015), upon which the District Court so heavily relied, and *Tiffany v. United States*, 931 F.2d 271, 273-75 (4th Cir. 1991), only prove the point. *Li-Shou* was a negligence action

49

challenging the reasonableness of the Coast Guard's decision to kill a suspected pirate on the open seas, and *Tiffany* was a negligence action challenging the propriety of the military's split-second decision to shoot down a potentially hostile plane. Critically, *Tiffany* actually underscores the obvious distinction here, by recognizing the PQD analysis would be categorically different if plaintiffs alleged (as Plaintiffs do here) that, "the government violated any federal laws contained either in statutes or in formal published regulations." *Id.* at 280.

Likewise, cases involving intentional torts are unlikely to implicate political questions. In *Lane v. Halliburton*, 529 F.3d 548, 560-62 (5th Cir. 2008), the court emphasized that, unlike negligence torts, intentional torts can proceed because the latter "allow causation to be proven under one tort doctrine without questioning the Army's role." *See Taylor*, 658 F.3d at 411 (quoting *Lane*, 529 F.3d at 561-62); *see also id*. at 410-11 (contrasting negligence claim in *Carmichael*, which is dependent on military reasonableness, with fraud and misrepresentation claims in *Lane*, which are governed by legal standard). Here, as in *Lane*, adjudication of Plaintiffs' intentional torts—based on statutory and common law criteria—will be independent of military judgment.

This case is also unlike the negligence claims in *Taylor*, *Carmichael* and *Harris*, because the decisions taken there were inherently discretionary and were not on their face unlawful. Torture and war crimes are criminal acts. There is no

50

discretion—for the military or its contractors—to make the choice to engage in such acts or order another to do so when Congress and military law and policy proscribe it.

The District Court also concluded, without citation to evidence or law, that CACI would likely assert "that their actions were ordered by the military," which would require the court "to consider whether military judgments were proper." A1390. This is incorrect as a matter of fact and law.

First, despite making ominous and opaque suggestions throughout this litigation (including in support of dismissal twice before this Court), CACI has offered no evidence that the U.S. military ordered or authorized the torture and abuse of Abu Ghraib detainees. And there is none. In addition, despite CACI's cynical attempt to surface a "torture debate" about the treatment of other detainees in secret CIA custody or in Guantanamo, all of the abuse suffered by Plaintiffs in Abu Ghraib was clearly prohibited by military law, policy, and rules of engagement in place at the time, and there was never any question about the full protections of the Geneva Conventions applying to all detainees in Iraq. *See supra* Statement of Facts section E.

These prohibitions are no doubt why the U.S. military, Defense Secretary Rumsfeld, and President Bush, as well as Congress, expressed outrage at the Abu Ghraib abuses and urged "that all individuals responsible for such despicable acts

be held accountable." *Al Shimari II*, 758 F.3d at 521 (quoting S. Res. 356, 108th

Cong. (2004)).  These prohibitions are also why CACI's co-conspirators, such as

Charles Graner and Ivan Frederick, were court-martialed—and served years in

prison— █████████████████████████████████████████████

████████.  *See supra* Statement of Facts section C.2.  The United States

government also previously emphasized to this Court in prior proceedings "the

strong federal interest" in remediating violations of the federal torture statute,

which trumps the countervailing interest in preempting the application of state law

to contractors.  A1306, Brief of United States as Amicus Curiae, *Al Shimari v.

CACI Int'l, Inc.*, No. 09-1335 at 22 (4th Cir. Jan. 14, 2012).  It would be perverse

for U.S. military personnel to face *criminal* liability for conduct while civilian

contractors—operating for billions in profit—are afforded *de facto* immunity from

*civil* liability for ordering the same illegal conduct.

Finally, there is no principle of law that excuses liability because the illegal

conduct was ordered by another party, even if that other party had been the United

States government.[12]  Accordingly, this imagined defense is irrelevant to the

---

[12] The United States government has firmly instructed that the prohibition against
torture is nonderogable and can never be excused or justified: "No circumstance
whatsoever, including war . . . or *an order from a superior officer or public
authority*, may be invoked as a justification for or defense to committing torture."
United Nations Convention Against Torture and Other Cruel, Inhuman or
Degrading Treatment or Punishment, Committee Against Torture, Consideration of
Reports Submitted by States Parties Under Article 19 of the Convention,

8198372v.6

specific question actually presented in this case: did CACI conspire with MPs to commit the alleged acts of abuse and do these acts of abuse meet the statutory and common law definitions of torture, war crimes, and CIDT? Given this clear jurisdictional directive, the court cannot avoid its duty simply because "the question is difficult, the consequences weighty, or the potential real for conflict with the policy preferences of the political branches." *Zivotofsky*, 132 S. Ct. at 1432 (Sotomayor, J., concurring).

## V.    PLAINTIFFS' WELL-ESTABLISHED STATUTORY AND INTENTIONAL TORT CLAIMS HAVE JUDICIALLY MANAGEABLE STANDARDS

The District Court added a third prong to the *Taylor* test, importing the *Baker* requirement regarding judicially manageable standards. A1399. This error evidences a further misunderstanding of the PQD. The *Taylor* test already incorporates this *Baker* element because if a court finds that the contractor's alleged negligent act was directed by the military, there would necessarily be no

---

Addendum to the Second Periodic Reports of States Parties Due in 1999, United States of America, CAT/C/48/Add.3/Rev.1 ¶ 6 (Jan. 13, 2006) (emphasis added).

A defense of "following orders" would not apply to any military officials, as demonstrated by the courts martial of Graner and Frederick, and makes even less sense for private military contractors who have no duty to follow military commands. *See In re "Agent Orange" Prod. Liab. Action*, 373 F. Supp. 2d 7, 99 (E.D.N.Y. 2005) ("If defendants were ordered to do an act illegal under international law they could have refused to do so, if necessary by abandoning their businesses."). In fact, CACI's contract and the governing military regulations required them to refrain from abuse.

8198372v.6

standards to judge the military's discretionary judgment; conversely, if the contractors' negligence was independent of military direction, the court could adjudicate those claims as it would against any private party according to traditional legal standards. Because CACI acted intentionally and illegally, there is no question that intentional tort claims here against this private entity are justiciable.

In any event, the District Court's analysis of this element is fundamentally misguided. First, the mere "lack of clarity" or a court's "doubt as to the lucidness" of a claim does not render judges incompetent to adjudicate it; this position reflects a worrisome abdication of the judicial role to "say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803); *Zivotofsky*, 132 S. Ct. at 1432 (emphasizing that complexity of a claim does not obviate obligation to adjudicate it). Second, in reinstating Plaintiffs' ATS claims in 2012, the District Court already concluded that torture, war crimes and CIDT are sufficiently "specific and universal and obligatory" to be cognizable torts under *Sosa*. (*See* Dkt. 159; dkt. 471, at 26:15-23.) That prior decision is indisputably correct, and demonstrates that there are judicially manageable standards. *See Sosa*, 542 U.S. at 724-25, 732 (affirming that courts have had, at least since *Filártiga v. Peña-Irala*, 630 F.2d 876

54

(2d Cir. 1980), ATS jurisdiction over claims of torture); War Crimes Act, 18

U.S.C. § 2441(c), (d)(1).[13]

### A.    Torture

The basic elements of a claim of torture were clear well before Plaintiffs'

detention at Abu Ghraib.  The federal anti-torture statute, enacted in 1994 to

implement the 1984 CAT, defines torture as an act "specifically intended to inflict

severe mental and physical pain or suffering . . . upon a person within his custody

or physical control."  18 U.S.C. § 2340(1); *see also* § 2340(2) (defining "severe

mental pain or suffering").  Likewise, the TVPA, enacted in 1992, adopts a similar

definition of torture.  28 U.S.C. § 1350 note § 3(b)(2)(A), 106 Stat. 73 (1992)

("intentional[] inflict[ion]" of "severe pain or suffering"); *see also* War Crimes

Act, 18 U.S.C. § 2441(d)(1)(A).  The District Court's conclusion that the "lack of

clarity" around the torture definition renders the conduct nonjusticiable would

make the express criminal and civil remedies created by the Torture Statute and the

TVPA nonjusticiable in all cases.

The conclusion also ignores years of precedent prior to 2003 finding that

torture claims had judicially manageable standards.  *See, e.g.*, *Abebe-Jira v.*

---

[13] Without explanation or assertion by either party, the District Court incorrectly
assumed Iraqi substantive law governed Plaintiffs' claims even though that
determination is irrelevant to the PQD analysis.  A1400.  In any event, it is clear
that federal common law incorporating international law governs Plaintiffs' ATS
claims, *Sosa*, 542 U.S. at 712, and Plaintiffs maintain that Virginia law governs the
state law claims.

*Negewo*, 72 F.3d 844, 845 (11th Cir. 1996) (forcing a detainee to undress, binding her arms and legs, whipping her, and threatening her with death constituted torture); *Al-Saher v. INS*, 268 F.3d 1143, 1147 (9th Cir. 2001) (binding, blindfolding, and severely beating a detainee constituted torture); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 92-93 (D.C. Cir. 2002) (torture includes "sustained systematic beating, application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain"); *Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38, 45 (D.D.C. 2000) (torture includes both the "deprivation of basic human necessities" and "direct attacks on a person," including stripping a detainee naked, blindfolding him, and threatening him with electrocution or a gun); *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 264 (D.D.C. 2002) ("cruel, inhumane conditions, den[ying] sufficient food and water, subject[ion] to constant and deliberate demoralization, physical[ ] beating[s]" and denial of essential medical treatment constitute torture).

The District Court's invocation of *Padilla v. Yoo*, 678 F.3d 748 (9th Cir. 2012), is misguided: at a minimum, that court found the dispute about the contours of the right at issue to be justiciable. And in adjudicating Yoo's claim to qualified immunity in the *Bivens* context, the court asked the distinct question of whether it was clearly established that "enemy combatants" are entitled to the same *constitutional* rights as "ordinary prison inmates." *Padilla*, 678 F.3d at 755. First,

56

unlike a government employee, CACI is not entitled to qualified immunity. *See Richardson v. McKnight*, 521 U.S. 399, 405, 409 (1997). Second, Plaintiffs were not "enemy combatants," *Al Shimari II*, 758 F.3d at 521 n. 2, whose legal status was considered novel. It is undisputed that the Geneva Conventions applied to detainees in Iraq, including their prohibitions against torture. *See, e.g.*, Fourth Geneva Convention, arts. 3, 5, 147. In this case, because the international norms met the *Sosa* standard for torture, a trier-of-fact has manageable standards to assess whether the conduct violates those norms.

### B.    Cruel, Inhuman or Degrading Treatment

The elements of claims of CIDT are also well-established and set forth in the War Crimes Act. *See* 18 U.S.C. § 2441(d)(1)(B). The District Court's analysis would similarly render the War Crimes Act nonjusticiable.

"The principal difference between torture and [CIDT] is 'the intensity of the suffering inflicted.'" *Doe v. Nestlé, S.A.*, 748 F. Supp. 2d 1057, 1077 (C.D. Cal. 2010) (quoting Restatement (Third) of Foreign Relations, § 702 n.5), *vacated*, 738 F.3d 1048 (9th Cir. 2013). The "gradations . . . are marked only by the degrees of mistreatment the victim suffers, by the level of malice the offender exhibits and by evidence of any aggravating or mitigating considerations that may inform a reasonable application of a distinction." *Al-Quraishi v. Nakhla*, 728 F. Supp. 2d 702, 759 (D. Md. 2010).

57

Federal courts have long rejected the notion that CIDT claims are untenable merely because they can be distinguished from torture only as a matter of degree. *See, e.g.*, *Doe v. Qi*, 349 F. Supp. 2d 1258, 1332 (N.D. Cal. 2004); *Tachiona v. Mugabe*, 234 F. Supp. 2d 401, 437 (S.D.N.Y. 2002) (explaining that "the challenges of drawing distinctions" should not "deter from the task of supplying content drawn from real experience"), *rev'd on other grounds sub nom. Tachiona v. United States*, 386 F.3d 205 (2d Cir. 2004).

A number of decisions have found conduct that constitutes CIDT along an identifiable "spectrum."  *William v. AES*, 28 F. Supp. 3d 553, 566 (E.D. Va. 2014) (collecting cases); *see also, e.g.*,  *Jama v. U.S. I.N.S.*, 22 F. Supp. 2d 353, 358 (D.N.J. 1998) (detainees sleeping under bright lights 24 hours a day, lived in filth and constant smell of human waste, being packed in rooms with twenty to forty detainees, beaten, deprived of privacy, subjected to degrading comments from guards and sexual abuse); *Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322, 1348-49 (N.D. Ga. 2002); *Wiwa v. Royal Dutch Petroleum Co.*, No. 96 CIV. 8386 (KMW), 2002 U.S. Dist. LEXIS 3293, at *25 (S.D.N.Y. Feb. 22, 2002).

Even though the question has nothing to do with the PQD, and even though the District Court already concluded that CIDT claims were cognizable under *Sosa*, the District Court erred in concluding that CIDT claims cannot be asserted by alien detainees held in Iraq.  In support of this position, the District Court

8198372v.6

purported to rely on the United States government's reservations to the CAT.

Regardless of whether those reservations are binding here—or whether the District

Court's understanding of them is correct—Plaintiffs' CIDT claim is not solely

based on the CAT. Rather, "numerous U.S. courts have concluded that the

prohibition against [CIDT] is a norm of customary international law," *Aldana v.*

*Del Monte Fresh Produce, N.A., Inc.*, 452 F.3d 1284, 1286-87 (11th Cir. 2006)

(Barkett, J. dissenting) (collecting cases).

### C.    War Crimes

The War Crimes Act provides that a war crime is any "grave breach" of the

Geneva Conventions, including Common Article 3 violations constituting torture,

CIDT, intentionally causing bodily injury, or sexual assault or abuse, among

others. 18 U.S.C. § 2441. The Geneva Conventions mandate that all individuals

are protected from universally condemned torture and war crimes *regardless* of

their status—*i.e.*, civilian or combatant. *See, e.g.*, Third Geneva Convention;

Fourth Geneva Convention, arts. 3, 5 (applying to any individual in detention with

no consideration of status). *Hamdan*, 548 U.S. at 631-32, could not be more clear

that Article 3, common to all the Geneva Conventions, applies to all captive

individuals, including so-called "enemy combatants," and that "grave breaches" of

Common Article 3 (which would include torture and CIDT) are punishable as war

8198372v.6

crimes. There is no required "innocence" threshold—however that vague term is to be understood—for war crimes. *Id.*

The District Court's incorrect view that war crimes apply only to "innocent civilians," is based on its misreading of *In re Xe Servs. Alien Tort Litig.*, 665 F. Supp. 2d 569, 582 (E.D. Va. 2009), which involved decisions regarding who could be *targeted* for attack. While armies may lawfully target and kill combatants, all detainees, whether civilians or soldiers rendered *hors de combat* are entitled to protection from the war crimes of torture and CIDT. *See, e.g.*, *Hamdan*, 548 U.S. at 629-30. And, as this Court has already found, Plaintiffs were not enemy combatants. *Al Shimari II*, 758 F.3d at 521 n. 2; they were "civilian internees."

## **CONCLUSION**

For the foregoing reasons, the Court should reverse the District Court's order granting CACI's motion to dismiss Plaintiffs' ATS claims and Plaintiff Al Shimari's common law claims.

By /s/ *Baher Azmy*

Baher Azmy
Katherine Gallaher
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Telephone: (212) 614-6464
Facsimile: (212) 614-6499

60

8198372v.6

Robert P. LoBue
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 336-2000

Jeena Shah
CONSTITUTIONAL RIGHTS &
INTERNATIONAL HUMAN RIGHTS CLINIC
Rutgers School of Law
123 Washington Street
Newark, New Jersey 07102
(973) 353-3235

Shereef Hadi Akeel
AKEEL & VALENTINE, P.C.
888 West Big Beaver Road
Troy, Michigan 48084
(248) 918-4542

8198372v.6

## REQUEST FOR ORAL ARGUMENT

Because this case presents important questions regarding the Fourth Circuit's political question doctrine jurisprudence, and because the District Court's reasoning with regard to and application of the political question doctrine and jurisdictional fact-finding could have significant consequences in tort cases broadly, and particularly for victims of war crimes, torture, and cruel, inhuman or degrading treatment directed by U.S. private actors, Plaintiffs believe that the Court's decisional process would be aided by oral argument.

8198372v.6

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief (as indicated by word processing program, Microsoft Word) contains 13,944 words, exclusive of the portions excluded by Rule 32(a)(7)(B)(iii). I further certify that this brief complies with the typeface requirements of Rule 32(a)(5) and type style requirements of Rule 32(a)(6) because this brief has been prepared in the proportionally spaced typeface of 14-point Times New Roman.


By /s/ *Baher Azmy*

Baher Azmy

September 21, 2015

8198372v.6

## CERTIFICATE OF SERVICE

I hereby certify that on this date I am causing this brief to be filed electronically via this Court's CM/ECF system, which will automatically serve the following counsel of record:

John Frederick O'Connor, Jr.
STEPTOE & JOHNSON, LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000


/s/ Baher Azmy

Baher Azmy

September 21, 2015